## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EDWIN ANTHONY RAMOS-RAMIREZ, | No. 4:17-CV-01442 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| BERWICK BOROUGH, KENNETH STRICH, REAGAN RAFFERTY, and RANDY GAUGER, | |
| Defendants. | |

### MEMORANDUM OPINION

#### MARCH 29, 2022

Edwin Anthony Ramos-Ramirez was shot by Berwick Borough Police Officer Reagan Rafferty while chasing a man on his property, knife in hand. Although Ramos-Ramirez pleaded guilty to simple assault for brandishing the knife, he sued Officer Rafferty—as well as Berwick Borough and the other officers at the scene—for excessive force.

The Defendants now move for summary judgment. With this motion rests the fate of the case, but the issue before the Court is discrete: whether Ramos-Ramirez, when shot, was close enough to the man he was chasing such that a reasonable police officer would believe that Ramos-Ramirez posed an immediate threat. If the summary judgment record establishes indisputably that he was, then summary judgment is proper. If not, the case proceeds to trial.

Despite the Defendants' claims to the contrary, there is a genuine factual dispute about how close Ramos-Ramirez was to the other man at the time of the shooting. Accordingly, the Defendants' motion for summary judgment is denied.

## I.   BACKGROUND

### A.   Facts

On the night of August 16, 2015, Ramos-Ramirez and his girlfriend, Brittney Cope, got into an argument while lying in bed at Cope's home, where the couple lived with their newborn daughter.[1] This seemingly innocuous dispute—the couple was "arguing about [Ramos-Ramirez] going out drinking at bandits"— escalated quickly.[2] According to a witness statement Cope gave to the Pennsylvania State Police the following morning at 2:15 a.m., Ramos-Ramirez "dumped [his] soda on the carpet" and then started "screaming in [Cope's] face also slapping [her] in the face with his shoe several times."[3] Cope went outside, and then Ramos-Ramirez "closed [the] front door and locked [her] out."[4]

---

[1]   Doc. 28-10, Ex. J (PA State Police – B. Cope Witness Statement) at 1; *see also* Doc. 28-9, Ex. I (June 11, 2018 E.A. Ramos-Ramirez Dep.) at 21:19–20 ("I have two babies. Sorry to interrupt you. I have two babies. Back then I had one baby."), 33:3–7 ("[Q.] Well, let me ask you this. You said you've got two kids. Who is the mother of the two kids? A. [Cope] is. Q. Of both? A. Right. Q. Okay. So how old are the children? A. Two and one."), 45:7–22 ("Q. From the time when this incident happened, had you lived with her for a week, a month, a year? How long did you live at her house? A. Probably was like two months. Q. Two months? A. Yeah. Q. How pregnant was she at the time of this incident? A. She was about, let's say, six months, five months. Q. Okay. Well, how—what's the date of birth of your two-year-old? A. February 6th. Q. Of '16? A. Yes.").

[2]   Doc. 28-10, Ex. J (PA State Police – B. Cope Witness Statement) at 1.

[3]   *Id.*

[4]   *Id.* at 2.

For his part, Ramos-Ramirez denies hitting Cope,[5] and she later claimed that she did not "think he intentionally slapped [her]," explaining "[i]t just happened that way."[6] That said, Ramos-Ramirez acknowledges that he locked Cope, who was then pregnant with their second child,[7] out of the house.[8]

Locked outside, Cope called her ex-boyfriend, Alfredo Melendez, and asked him "to kick [Ramos-Ramirez] out of [her] house."[9] Melendez arrived shortly after and "tried getting in [Cope's] window to get [her] car keys and when he opened it [Ramos-Ramirez] tried stabbing him with a kitchen knife."[10] Ramos-Ramirez and Cope then separately called 911: Ramos-Ramirez told the 911 operator that Melendez was "trying to break into the house through the windows"[11]; Cope "called the cops and told them [she] needed help," and "[t]hey told [her] to stay

---

[5]  Doc. 28-9, Ex. I (June 11, 2018 E.A. Ramos-Ramirez Dep.) at 32:18–20 ("Q. Did you smack [Cope] around before the police were called that night? A. No. No. That's a total lie."), 34:12–25 ("Q. Okay. And you're saying that when [Cope] told the police officers that you had smacked her in the face that that—she was lying about that? A. She was being manipulated by the ex [i.e., Melendez], the guy that she called, to go and testify against me. Q. Anthony, I'm not asking about your explanations. I'm asking you very simply. It's a yes or no question. A. I know. No. Q. Did you— A. No. No. Q. Did you smack her? A. No."), 130:6–11 ("Q. My question is real simple. Did you hit her the night of the incident which caused her to call the police? A. Think about it. No. No. Q. No? A. No.").

[6]  Doc. 28-6, Ex. F (Dec. 10, 2018 B. Cope Dep.) at 75:10–14; *see also id*. at 76:6–8 ("Q. Okay. But you think it was an accident that he hit you in the face with the shoe? A. Yes.").

[7]  Doc. 28-9, Ex. I (June 11, 2018 E.A. Ramos-Ramirez Dep.) at 34:5–11 ("Q. Okay. And was [Cope] pregnant at the time of this incident? A. Yes, she was. Q. Okay. And did you know she was pregnant? A. Right. Of course.").

[8]  *Id*. at 37:5–9 ("Q. Okay. [Cope] also told the State Police that you pushed in the screen door on the house and broke it. Is that right? Or did you do that? A. I locked her out of the house.").

[9]  Doc. 28-10, Ex. J (PA State Police – B. Cope Witness Statement) at 2.

[10]  *Id*.

[11]  Doc. 28-9, Ex. I (June 11, 2018 E.A. Ramos-Ramirez Dep.) at 56:15–18.

away from [Ramos-Ramirez and Melendez] and [then] stayed [on the phone] with [her] until the police arrived."[12]

The parties agree, as they must, that when the police arrived, Ramos-Ramirez was holding a knife and chasing Melendez, intending to stab him.[13] But the circumstances surrounding this portion of the incident remain in dispute.

According to the Berwick Borough Police Department Incident Report, "[u]pon arrival to the scene, officers observed a male armed with a knife attack another male outside of the residence," and then Officer Rafferty "shot the attacker in the left shoulder."[14] The incident report prepared by the Pennsylvania State Police supports this account of events and provides substantially more detail:

> When Patrolman RAFFERTY arrived MELENDEZ was standing on the front porch and RAMOS RAMIREZ was standing inside a doorway of the residence while COPE and her mother . . . were standing on the sidewalk. As Patrolman RAFFERTY exited his marked patrol car and walked around the front of his vehicle, he observed MELENDEZ standing on the front porch holding a piece of wood and ordered him to drop the weapon, to which Melendez complied.

---

[12]   Doc. 28-10, Ex. J (PA State Police – B. Cope Witness Statement) at 2.

[13]   Doc. 52 at 11 (asserting that Ramos-Ramirez "can no longer argue that he did not chase Melendez"); Doc. 57 at 8 ("[W]hile [the] Defendants are right that the Third Circuit held that [Ramos-Ramirez] cannot claim he was not chasing Melendez, they found that [Ramos-Ramirez] could claim it was impossible for him to harm Melendez based on where he was."); *see also* Doc. 28-11, Ex. K (Jan. 10, 2017 E.A. Ramos-Ramirez Guilty Plea Hearing) 3:23–4:18 ("[Court]: Sir, is it your desire to plead guilty to this simple assault charge we just added? [Ramos-Ramirez]: Yes, your honor. . . . [Prosecutor]: It is alleged that on or about the 15th day of August, 2015, in the Borough of Berwick, the Defendant did attempt to cause bodily injury to the victim Alfredo Melendez using a deadly weapon, namely a knife, by chasing him with said knife. [Court]: Are those facts true, Sir? [Ramos-Ramirez]: Yes, your Honor.").

[14]   Doc. 28-2, Ex. B (Berwick Police Dept. Incident Report) at 4.

MELENDEZ began to descend from the front porch
when RAMOS RAMIREZ exited the residence after
MELENDEZ. As RAMOS RAMIREZ exited the
residence he was holding a large silver knife and began
to chase MELENDEZ in an aggressive manner, off of the
front porch and into the front yard. Patrolman
RAFFERTY drew his duty weapon from his holster . . .
[and] ordered RAMOS RAMIREZ to drop the knife as he
descended from the front porch after MELENDEZ, to
which he failed to comply.

MELENDEZ ran at a southeastern direction off the porch
into the front yard before turning (right) and running in a
western direction across the front yard. RAMOS
RAMIREZ was still chasing after MELENDEZ with the
knife raised. Patrolman RAFFERTY (standing on the
sidewalk) repeatedly ordered RAMOS RAMIREZ to
drop the knife; which he failed to comply. As RAMOS
RAMIREZ was closing in on the distance between he
and MELENDEZ, Patrolman RAFFERTY fired one shot
from his . . . duty weapon, striking RAMOS RAMIREZ
in the left shoulder area, causing him to fall to the
ground.[15]

This account accords with both Officer Rafferty's and co-Defendant Chief

Kenneth Strish's deposition testimony.[16] Specifically, Officer Rafferty testified that

he saw Ramos-Ramirez "chase[] [Melendez] down the steps, off the steps, . . . east

into the yard," successfully "clos[ing] the gap to approximately a few feet," at

which time Officer Rafferty "discharged one round."[17] Officer Rafferty stated that

---

[15]   Doc. 28-7, Ex. G (PA State Police Incident Report) at 3–4.

[16]   The final individual Defendant in the case, Officer Randy Gauger, testified that the shooting
      occurred "[l]ess than 10 seconds" after he exited his vehicle, and, as such, he could not see
      "where the individuals in front of the home were standing." Doc. 28-5, Ex. E (Dec. 10, 2018
      Officer Gaugler Dep.) at 25:1–26:7.

[17]   Doc. 28-8, Ex. H (July 2, 2018 Officer Rafferty Dep.) at 51:22–25, 52:13–25.

Ramos-Ramirez and Melendez were "within 2 to 4 feet of each other at the time the shot was fired."[18] Similarly, Chief Strish testified that he saw Melendez run away from Ramos-Ramirez, who pursued Melendez while carrying the knife above his head; it was then that Officer Rafferty shot Ramos-Ramirez.[19]

But Ramos-Ramirez disputes these descriptions of the incident. According to Ramos-Ramirez, when he was shot, he was outside the house on the porch,[20] whereas Melendez was out in the yard, "[p]retty far" away.[21] Asked to clarify the distance, Ramos-Ramirez testified that Melendez was at least twenty feet away when Officer Rafferty fired his gun.[22]

Cope has (again) provided contradictory statements on what occurred that night. In the witness statement she gave to the Pennsylvania State Police, Cope

---

[18]   *Id*. at 58:5–22.

[19]   Doc. 28-4, Ex. D (July 2, 2018 Chief Strish Dep.) at 76:24–77:10 ("Q. All right. Now, at the time that the shot went out— A. Um-hum. Q. —were you able to see Ramos as he was struck? A. That I don't absolutely know. I know while the two men were running, they came easterly towards my vehicle and, again, like I say, but they turned around and went the other direction. One man had the knife above his head. And I heard the shot and I just saw one person standing, coming towards me and I dealt with that one person.")**.**

[20]   Doc. 28-9, Ex. I (June 11, 2018 E.A. Ramos-Ramirez Dep.) at 73:4–13 ("Q. So let me—let me jump ahead. When you were shot, were you still on the porch? A. Yeah. I got shot on the porch, and then I walked down the—this is concrete— Q. Right. A. —that you see right there. There's two stairs right there. Q. Okay., A. So I got shot, and I walked down, and lay on the grass. Because I was so much—it was painful.").

[21]   *Id*. at 138:1–17 ("Q. Okay. So you were on the porch with the knife in your hand. Alfredo [Melendez] was down further in the yard? A. Diagonal. Diagonal. Right. Q. Okay. And you were afraid that he was going to run up on the porch again? A. No. I was always afraid—I was afraid all the time. Q. Okay. But you had gotten him to leave the porch. Right? He had— A. I just came out and he left. Q. Okay. So when you came out with the knife, he left and he was— A. Right. Pretty far.").

[22]   *Id*. at 148:1–7 ("[Q.] Where specifically in reference to the front of the house were you at the time you were shot? A. Porch. Q. Okay. And at that point, where was Alfredo [Melendez]? A. All the way on the corner, which would be about 20 feet away from me, at least.").

wrote that Ramos-Ramirez "ran after [Melendez] with the knife," and "[a]s [Ramos-Ramirez] was running . . . [t]he police [then] shot once at [him] in his shoulder."[23] But Cope later disavowed this statement, testifying at her deposition that "what [she] put down [in the incident report] is not true."[24] During her deposition, Cope testified that "everything just happened so quickly," explaining that Ramos-Ramirez "didn't even have time to run out of the house": Ramos-Ramirez "came out of the house and as soon as he came out of the house, the cop shot him."[25] When asked "where exactly was [Ramos-Ramirez] when the cop fired the gun," Cope stated, "I don't know exactly where he was but he was—I know he was nowhere near [Melendez]. Like, he just came out of my house and then the cop shot him."[26] She explained that Melendez, on the other hand, "was somewhere over . . . in the neighbor's yard."[27] As such, Cope testified that Ramos-Ramirez did not pose a threat to Melendez:

> Q. So my question to you is was—at the time the police shot [Ramos-Ramirez], was [Melendez] anywhere near him?
>
> A. No.
>
> Q. And did it appear to you as if [Ramos-Ramirez] was a threat to [Melendez]?

---

23  Doc. 28-10, Ex. J (PA State Police – B. Cope Witness Statement) at 2–3.
24  Doc. 28-6, Ex. F (Dec. 10, 2018 B. Cope Dep.) at 57:4–6.
25  *Id*. at 55:2–10.
26  *Id*. at 57:11–15.
27  *Id*. at 64:20–25.

A. No.

Q. And is there any way, shape, or form from where [Ramos-Ramirez] was that he could have hurt [Melendez] with the knife at that time?

A. No.[28]

Following the incident, Ramos-Ramirez was charged in the Court of Common Pleas of Columbia County, Pennsylvania with, among other things, simple assault with a deadly weapon.[29] As Columbia County Common Pleas Judge Gary E. Norton explained to Ramos-Ramirez, to prove that he committed "this kind of simple assault," the Commonwealth must show "that [he] attempted to cause bodily injury to another person, and in this particular case with a deadly weapon, specifically a knife."[30]

On January 10, 2017, Ramos-Ramirez pleaded guilty to this charge, admitting on the record that "on or about the 15th day of August, 2015, in the Borough of Berwick, [he] did attempt to cause bodily injury to the victim Alfredo Melendez using a deadly weapon, namely a knife, by chasing him with said knife."[31] For this crime, Ramos-Ramirez was sentenced to a period of incarceration "of not less than four months nor more than twelve months, effective March 30, 2017.[32]

---

[28]   *Id*. at 107:4–14.
[29]   Doc. 28-11, Ex. K (Jan 10, 2017 E.A. Ramos-Ramirez Guilty Plea Hearing Tr.).
[30]   *Id*. at 4:1–6.
[31]   *Id*. at 4:11–18.
[32]   Doc. 28-13, Ex. M (Mar. 29, 2017 E.A. Ramos-Ramirez Sentencing Hearing) at 14:10–25.

### B.    Procedural History

On August 14, 2017, Ramos-Ramirez sued the Defendants, asserting four cases of action: Count I – *Morell* claims against Berwick Borough and Chief Strish; Count II – excessive force under 42 U.S.C. § 1983 against Officer Rafferty; Count III – civil rights conspiracy against Chief Strish and Officers Rafferty and Gauger; and Count IV – state law tort claims against Officer Rafferty.[33] The Defendants then moved for summary judgment on all counts.[34]

In May 2019, the Court granted the Defendants' summary judgment motion.[35] Relevant here, the Court held that Ramos-Ramirez's excessive force claim (Count II) was barred by *Heck v. Humphrey*, which requires dismissal of any § 1983 claim that would "necessarily imply the invalidity" of the plaintiff's prior criminal conviction.[36] The Court explained that because Ramos-Ramirez pleaded guilty to simple assault with a deadly weapon and admitted to "chasing [Melendez] with a knife in an attempt to cause bodily injury," he cannot now claim that "he acted 'peacefully,' was not chasing [Melendez], [and] did not make any threatening movements toward him."[37] The Court emphasized that for his excessive force claim, Ramos-Ramirez "does not argue that even if he were

---

33  Doc. 1.
34  Doc. 27.
35  Doc. 39; Doc. 40.
36  Doc. 39 at 4–8 (citing *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994)).
37  *Id*. at 5–6 (citing Doc. 28-11, Ex. K (Jan. 10, 2017 E.A. Ramos-Ramirez Guilty Plea Hearing Tr.) at 3–5).

chasing [Melendez] with a knife, Officer Rafferty's force was unreasonable; rather, Ramos-Ramirez argues that Officer Rafferty's decision to shoot was unreasonable because Ramos-Ramirez wasn't chasing [Melendez] at all."[38]

Ramos-Ramirez appealed the ruling to the United States Court of Appeals for the Third Circuit,[39] which vacated the judgment and remanded the case for further proceedings consistent with its opinion.[40] The Third Circuit explained that "simple assault with a deadly weapon under Pennsylvania law is not necessarily inconsistent with an excessive force claim," as "[i]t is possible that an individual could attempt to cause bodily injury to a third party and that a police officer could use excessive force in their attempt to intervene."[41]

Importantly, on appeal, Ramos-Ramirez asserted that his excessive force claim was actually predicated on two distinct theories: first, that Officer Rafferty "used excessive force because [he] was not chasing Melendez"; and second, that "even if he was chasing Melendez, Officer's Rafferty's force was excessive because [Ramos-Ramirez] was too far away from Melendez to stab him and, thus, was not an immediate threat."[42] In its opinion, the Third Circuit agreed with this Court that the "first argument would negate an element of his simple assault conviction and is barred by *Heck*"; however, it held that the "second argument"—

---

[38]   *Id*. at 6.
[39]   *See* Doc. 42.
[40]   *Ramos-Ramirez v. Berwick Borough*, 819 F. App'x 103, 107 (3d Cir. 2020).
[41]   *Id*. at 106.
[42]   *Id*. (emphasis in original)

which Ramos-Ramirez did not advance before this Court—"does not imply the invalidity of his conviction" and is therefore "not barred by *Heck*."[43]

On remand, the sole theory for excessive force upon which Ramos-Ramirez can proceed is that "he was simply too far away from Melendez to pose an immediate threat."[44] Confronting this theory, the Defendants again move for summary judgment.[45] That motion has been fully briefed and is now ripe for disposition.[46]

## II.    LAW

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[47] Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[48] A defendant "meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[49] Conversely, to survive summary judgment, a plaintiff must

---

[43]  *Id*. at 106–07.
[44]  *Id*. at 107.
[45]  Doc. 51.
[46]  Doc. 52; Doc. 57; Doc. 60.
[47]  Fed. R. Civ. P. 56(a).
[48]  *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (quoting *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).
[49]  *Clark*, 9 F.3d at 326.

"point to admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law."[50]

The party requesting summary judgment bears the initial burden of supporting its motion with evidence from the record.[51] When the movant properly supports its motion, the nonmoving party must then show the need for a trial by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[52] The nonmoving party will not withstand summary judgment if all it has are "assertions, conclusory allegations, or mere suspicions."[53] Instead, it must "identify those facts of record which would contradict the facts identified by the movant."[54]

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[55] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[56] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for purposes of the

---

[50]   *Id.*
[51]   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[52]   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).
[53]   *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).
[54]   *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002) (quoting *Childers v. Joseph*, 842 F.2d 689, 694–95 (3d Cir. 1988)).
[55]   *Liberty Lobby*, 477 U.S. at 252 (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871)).
[56]   *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

motion."[57] Finally, although "the court need consider only the cited materials, . . . it may consider other materials in the record."[58]

## III.    ANALYSIS

### A.    Excessive Force

The Defendants first argue that "the use of force by Officer Rafferty was constitutionally permitted and absolutely justified" because it is "clear from the record that [Ramos-Ramirez] was close enough to Melendez to cause him serious bodily harm as he chased him in Ms. Cope's front lawn."[59] Ramos-Ramirez disagrees, arguing that "there is a clear and unavoidable dispute as to [where he] was at the time he was shot."[60] The Court agrees with Ramos-Ramirez.

A police officer's "use of deadly force" when apprehending a subject constitutes "a seizure subject to the reasonableness requirement of the Fourth Amendment."[61] As such, courts must determine whether it was "objectively reasonable for the officer to believe, in light of the totality of the circumstances, that deadly force was necessary to prevent the suspect's escape, and that the suspect posed a significant threat of death or serious physical injury to the officer

---

[57]  Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613–14 (3d Cir. 2018).

[58]  Fed. R. Civ. P. 56(c)(3).

[59]  Doc. 52 at 15–16 (cleaned up).

[60]  Doc. 57 at 8.

[61]  *Tennessee v. Garner*, 471 U.S. 1, 7 (1985); *see also Graham v. Connor*, 490 U.S. 386, 394 (1989) ("When, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person.").

or others."[62] Relevant here, "[i]n determining the reasonableness of all degrees of force," courts consider "whether the suspect pose[d] an immediate threat to the safety of the officer or others."[63]

Recognizing the difficulty of resolving questions of "reasonableness" on summary judgment, the Third Circuit instructs that "reasonableness under the Fourth Amendment should frequently remain a question for the jury."[64] This is particularly true when facts central to the reasonableness determination remain contested, as it is improper for a district court, on summary judgment, to "resolve[] a dispute of material fact over [the defendant's] resistance" or "favor[] the movants' version of events."[65]

Here, the parties disagree on where Ramos-Ramirez was at the time of the shooting and, more importantly, how far he was from Melendez. According to Officer Rafferty, when he discharged his firearm, Ramos-Ramirez was off the porch and in the yard, only two to four feet from Melendez—barely an arm's

---

[62]   *Abraham v. Raso*, 183 F.3d 279, 289 (3d Cir. 1999).

[63]   *Id.* (citing *Graham*, 490 U.S. at 396).

[64]   *Id.* at 290; *see also Horton v. City of Harrisburg*, 2009 WL 2225386, at *3 (M.D. Pa. July 23, 2009) (Connor, J.) (denying summary judgment on excessive force claim because "reasonable jurors could reach differing outcomes when evaluating the propriety of [the officer's] use of force").

[65]   *Rosser v. Donovan*, 2021 WL 5055837, at * 3–4 (3d Cir. 2021) (vacating the district court's grant of summary judgment on excessive force claim because it improperly construed facts and drew inferences in the movant's favor); *see also Pelzer v. City of Philadelphia*, 656 F. Supp. 2d 517, 528 (E.D. Pa. 2009) (holding that defendant police officer "is not entitled to summary judgment [on excessive force claim] because the key facts of what [the plaintiff] was doing before he was shot and whether he ever raised his right hand towards the officer are still contested").

length away.[66] But in their deposition testimony, Ramos-Ramirez and Cope assert that Ramos-Ramirez was on the porch when he was shot, approximately twenty feet from Melendez, who was standing either at the edge of the property or in the neighbor's yard.[67]

In support of summary judgment, the Defendants point the Court to *Williams v. City of Scranton*, another case within this District involving an excessive force claim based on police officers shooting a civilian armed with a knife.[68] There, the court held the officers had probable cause to believe the plaintiff posed a significant threat of serious injury to their fellow officer, and therefore it was objectively reasonable for the officers to believe the use of deadly force necessary.[69] The court emphasized that "[t]he undisputed facts show that [the plaintiff] rapidly approached [the threatened officer] with a knife, ignored . . . warnings to stop and drop the knife, and was within several feet of [the officer] when she was shot."[70] But unlike in *Williams*, here the distance between the knife-wielding plaintiff (Ramos-Ramirez) and the threatened individual (Melendez) remains in dispute. That renders *Williams* inapposite, as the central question before

---

[66]   Doc. 28-8, Ex. H (July 2, 2018 Officer Rafferty Dep.) at 51:2–53:7, 58:5–22.
[67]   Doc. 28-9, Ex. I (June 11, 2018 E.A. Ramos-Ramirez Dep.) at 138:1–17, 148:1–7; Doc. 28-6, Ex. F (Dec. 10, 2018 B. Cope Dep.) at 55:2–10, 57:11–15, 64:20–25.
[68]   2013 WL 1339027 (M.D. Pa. 2013) (Caputo, J.).
[69]   *Id*. at *5–6.
[70]   *Id*. at *6.

this Court is whether Ramos-Ramirez "was simply too far away from Melendez to pose an immediate threat."[71]

If a jury accepts Ramos-Ramirez's and Cope's accounts of the incident, it could conclude that Ramos-Ramirez—twenty feet and several stairs away from Melendez—did not pose an immediate threat to Melendez's safety. Accordingly, the Court cannot conclude that the undisputed facts show it was "objectively reasonable" for Officer Raffety "to believe . . . that deadly force was necessary."[72] Officer Raffety is therefore not entitled to summary judgment on this basis.

## B.    Qualified Immunity

The Defendants next argue that Officer Rafferty is "entitled to the protections of qualified immunity" because "the right of [Ramos-Ramirez] to be free from being shot as he is attempting to assault another with a deadly weapon is not so sufficiently clear that 'every reasonable officer would have understood' that such force was not permissible."[73] Ramos-Ramirez responds that summary judgment is not appropriate because "the key fact which would purportedly justify the use of excessive force"—that is, whether he was close enough to Melendez to cause imminent injury—"is in dispute."[74] Again, the Court agrees with Ramos-Ramirez.

---

71 *Ramos-Ramirez*, 819 F. App'x at 107.
72 *Abraham*, 183 F.3d at 289.
73 Doc. 52 at 21–22 (cleaned up).
74 Doc. 57 at 11.

Under the doctrine of qualified immunity, "officers performing discretionary functions 'are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[75] In assessing "whether an officer is qualifiedly immune from suit," courts must determine "(1) whether the officer violated a constitutional right, and (2) whether the right was clearly established, such that it would have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted."[76]

As a general rule, "the issue of immunity should not be routinely submitted to the jury."[77] That said, "[j]ust as the granting of summary judgment is inappropriate when a genuine issue exists as to a material fact, a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis."[78] Accordingly, "the existence of disputed, historical facts material to the objective reasonableness of an officer's conduct will give rise to a jury issue."[79]

---

[75] *Curly v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[76] *Lamont v. New Jersey*, 637 F.3d 177, 182 (3d Cir. 2011) (internal quotation marks and citation omitted).

[77] *Curly*, 298 F.3d at 277 (citing *Hunter v. Bryant*, 502 U.S. 224, 228 (1991)).

[78] *Id*. at 278.

[79] *Id*.; *see also Pelzer*, 656 F. Supp. 2d at 530–31 (holding that because "[a] reasonable jury could find that [the defendant officer] was not objectively reasonable in believing [the plaintiff] presented an imminent, life-threatening danger to his safety," the court was "unable to conclusively determine . . . that [the defendant] did not violate [the plaintiff's] constitutional rights," and therefore "the inquiry is concluded and [the defendant] is not entitled to qualified immunity at this time").

As explained, certain material facts—in particular, the distance between Ramos-Ramirez and Melendez when Officer Rafferty shot Ramos-Ramirez—remain in dispute. Because a fair-minded jury could find that Officer Rafferty lacked an objectively reasonable belief that Ramos-Ramirez presented an imminent, life-threatening danger to Melendez, the Court cannot determine at this time that Officer Rafferty did not violate Ramos-Ramirez's constitutional rights.[80] The Court therefore declines to grant summary judgment on the basis of qualified immunity.

## IV.   CONCLUSION

It takes chutzpah to sue a police officer who shot you while you were trying to stab the man your pregnant girlfriend called after you repeatedly struck her in the face and locked her out of her house. But Ramos-Ramirez has chutzpah. Whether a jury rewards him for it remains to be seen. It is not, however, the Court's responsibility at this juncture to weigh the parties' competing versions of events. Rather, the Court must determine whether there exists a genuine dispute on a material fact in the case. Because such a dispute exists here, the Defendants' motion for summary judgment is denied.[81]

---

[80]   *See Pelzer*, 656 F. Supp. 2d at 530–31.

[81]   The Defendants assert that the Third Circuit's ruling in this case concerned only Count II (excessive force against Officer Rafferty), leaving undisturbed this Court's prior dismissal of the "claims against . . . the Borough of Berwick, Chief Kenneth Strish, and Officer Randy Gaugler." Doc. 52 at 1 n.1. That is only partially true. The bases for granting summary judgment on Counts III (conspiracy) and IV (state law tort claims) remain valid: Ramos-Ramirez consented to the dismissal of Count III, *see* Doc. 36 at 9, and the summary judgment

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

record does not establish that Officer Rafferty "knew the force was excessive and decided to shoot [Ramos-Ramirez] anyway." Doc. 39 at 10. However, this Court premised its decision granting summary judgment on Count I (*Monell* claim against Berwick Borough and Chief Strish) exclusively on Ramos-Ramirez's inability to "allege any viable constitutional claim." *Id*. at 9. Because the Third Circuit vacated this Court's judgment on Ramos-Ramirez's constitutional claim and that claim survives the instant motion, Count I necessarily survives as well. *See Ramos-Ramirez*, 819 F. App'x at 107 ("[W]e will vacate the District Court's judgment to the extent that it granted Appellees summary judgment under *Heck v. Humphrey* and will remand the case to the District Court for further proceedings consistent with this opinion.").